## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| **MICHAEL SHAWN PAYNE, JR.** | **CIV. ACTION NO. 3:22-05643** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **KILOLO KIJAKAZI, ACTING COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the court is Plaintiff's petition for review of the Commissioner's denial of social security disability benefits.   The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).   For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

## Background & Procedural History

Michael Payne, Jr. ("Payne") filed the instant application for Title XVI Supplemental Security Income payments on January 2, 2020.   *See* Tr. 27, 202-208.   Payne, who was 20 years old at the time of the administrative hearing, alleged a disability onset date of January 2, 2020, because of bipolar disorder and explosive behavior disorder.   *See* Tr. 202, 225.   The state agency denied the claim initially on April 13, 2020, and upon reconsideration on September 16, 2020.   (Tr. 91-93, 102-105, 107-113).   Thereafter, Payne requested and received a June 29, 2021 hearing before an Administrative Law Judge ("ALJ").   (Tr. 60-81).   In a July 12, 2021, written decision, the ALJ determined that Payne was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in significant numbers in the national economy.   (Tr. 24-41).   Payne sought

review of the adverse decision before the Appeals Council.

On July 26, 2022, the Appeals Council granted Payne's request for review, and stated that it intended to consider 35-pages of treatment records, dated from July 8, 2016, through June 8, 2017, which the ALJ had omitted from evidence.  (Tr. 196-201).   Nonetheless, even with consideration of this evidence, the Appeals Council explained that it intended to adopt the ALJ's findings and find Payne not disabled.  *Id*.   Before doing so, however, the Appeals Council accorded Payne 30 days to submit an additional statement and evidence, or to request an appearance.  *Id*.

On September 27, 2022, the Appeals Council acted on its stated intention, and issued a decision that adopted the ALJ's findings, further concluding that Payne was not disabled through the date of the ALJ's July 12, 2021 decision.  (Tr. 1-7).   The Appeals Council's decision became the final decision of the Commissioner.   (Tr. 1).

On October 10, 2022, Payne filed the instant complaint for judicial review of the Commissioner's final decision.   Following submission of the administrative transcript and supporting memoranda, the matter is now before the court.

**<u>Standard of Review</u>**

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence.   *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted).   The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.   Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations.   And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this

Court has said, is "more than a mere scintilla." It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, ___ U.S. ___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983). In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. § 423(d)(1)(A). A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii). Based on a claimant's age, education, and work experience, the SSA

utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)    An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and of the requisite duration.

(3)    An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

    Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4)    If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)    If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy. If the individual can make such an adjustment, then he or she will be found not disabled. If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd*, 239 F.3d at 704 -705; 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will

be rendered at that point without proceeding to the remaining steps.   20 C.F.R. §§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).   "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step."   *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The Commissioner's[1] Findings

### I.     Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.   (Tr. 29).   At step two, she found that the claimant suffered severe impairments of bipolar disorder, attention deficit disorder, and obesity.   (Tr. 29-30).[2]   She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.   (Tr. 30-33).

### II.     Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform work at the medium exertional level,[3] except that he is limited to an unskilled, simple, routine, and repetitive job; can have no interaction with the general public; can

---

[1] The Appeals Council's decision represents the Commissioner's final decision in this matter. However, the Appeals Council's decision adopted and essentially reincorporated the ALJ's findings and analysis.   Therefore, the court's reference to the Commissioner's findings or decision contemplates the ALJ's decision, as adopted by the Appeals Council.

[2] The ALJ specifically considered the allegation by the claimant's grandmother that he was blind in one eye.   *Id.*   However, she noted that the record did not contain objective medical evidence of the impairment by an acceptable medical source.   *Id.*   Accordingly, the ALJ concluded that it was not a medically determinable impairment.   *Id.*

[3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."   20 C.F.R. § 416.967(c).

have brief and superficial interaction with co-workers; can have occasional interaction with supervisors; requires a job that is low stress in nature, defined as no fast-paced or high-production quotas; can work in proximity to but not on joint or shared tasks; and must have a routine and predictable work place setting with no significant changes in the work setting and no changing demands or quotas in the work setting.   (Tr. 6, 34-39).

## III.    Steps Four and Five

The ALJ concluded at step four of the sequential evaluation process that the claimant was unable to return to past relevant work (because he had none).   (Tr. 39, 6).   Accordingly, she proceeded to step five.   At this step, the ALJ determined that the claimant was a younger individual, with at least a high school education.   (Tr. 39).   Transferability of skills was not at issue because the claimant had no past relevant work.   *Id*.

The ALJ next observed that, given the claimant's vocational factors, and if he had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.   20 C.F.R. §§ 404.1569, 416.969; Rule 203.28, Appendix 2, Subpart P, Regulations No. 4; Tr. 40.   However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent the additional limitations eroded the occupational base for work.   *Id*.   In response, the VE identified the representative jobs of **industrial cleaner**, *Dictionary of Occupational Titles* ("DOT") Code # 381.687-018; **inspector/hand packager**, DOT # 559.687-074; and **laundry folder**, DOT # 369.687-018, that were consistent with the ALJ's RFC and the claimant's vocational profile.   (Tr. 40, 76-78).[4]

---

[4] The VE responded that for the industrial cleaner, routing clerk, and kitchen helper jobs, there were about 1,219,000, 282,000, and 99,000 positions available nationwide, respectively.   (Tr.

<u>**Analysis**</u>

In his brief, Payne identified seven assignments of error:

(1)  The ALJ failed to properly apply the 5-step sequential evaluation.

(2)  The ALJ failed to consider all physical impairments at step three.

(3)  The ALJ failed to consider medical equivalence of mental and physical impairments at step three.

(4)  The ALJ incorrectly applied listing standards and failed to make sufficiently clear reasons for the decision.

(5)  The ALJ did not apply the applicable legal standard as to vocational testimony

(6)  The ALJ did not assess performance of three mentioned occupations "for a significant period of time" as required.

(7)  The ALJ did not include the required language in the step five decision.

(Pl. Brief [doc. # 10]).

The court generally will address Payne's arguments within the order and context of the sequential evaluation process.

**I.    Step Three**

The listings set out at 20 C.F.R. pt. 404, subpt. P, App. 1 are descriptions of various physical and mental illnesses and abnormalities that are categorized by the body system they affect.  *Sullivan v. Zebley*, 493 U.S. 521, 529–31; 110 S.Ct. 885, 891 (1990).   Each impairment is defined in terms of specific medical signs, symptoms, or laboratory test results.  *Id*.   "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical

---

76-78).   This incidence of work constitutes a significant number (and range) of jobs in the "national economy."   42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

criteria.   An impairment that manifests only some of those criteria, no matter how severely, does not qualify."   *Id.*; *see also* 20 C.F.R. §§ 404.1525(d) and 416.925(d).   Further, an impairment(s) is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment.   20 C.F.R. §§ 404.1526(a) and 416.926(a).   Again, however, "[t]he claimant must provide medical findings that support each of the criteria for the equivalent impairment determination."   *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990) (citations omitted).

In her decision, the ALJ explicitly considered whether Payne's impairments met or medically equaled Listings 12.04 for depressive, bipolar and related disorders and 12.11 for neurodevelopmental disorders.   (Tr. 31).   Listing 12.04 includes three paragraphs designated A, B, and C, whereas Listing 12.11 only has two paragraphs:   A and B.   20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00A(2).   For Listing 12.04 the claimant's mental disorder must satisfy the requirements of both paragraphs A and B, *or* the requirements of both paragraphs A and C.   *Id*. For Listing 12.11, the claimant's mental disorder must satisfy the requirements of both paragraphs A and B.   *Id*.

Paragraph B for both listings addresses four areas of mental functioning that a person uses in a work setting.   20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00A(2)(b).   They include the following:   understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.   *Id*.   To satisfy the B criteria, the mental disorder must result in "extreme" limitation of one, or "marked" limitation of two of the four areas of mental functioning.   *Id*.   A "marked" limitation means that the ability to function "independently, appropriately, effectively, and on a sustained basis is **seriously** limited."   20

8

C.F.R. pt. 404, subpt. P, App. 1, § 12.00F(2)(d) (emphasis added).    An "extreme" limitation

means the **inability** "to function in this area independently, appropriately, effectively, and on a

sustained basis."    20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00F(2)(e).    Conversely, a

"moderate" limitation means that the claimant's ability to function in this area "independently,

appropriately, effectively, and on a sustained basis is **fair**."    20 C.F.R. pt. 404, subpt. P, App. 1,

§ 12.00F(2)(c) (emphasis added).

      To satisfy the paragraph C criteria, the claimant's mental disorder must be "serious and

persistent," that is, there must be a medically documented history of the existence of the disorder

over a period of at least two years and evidence that satisfies the criteria in both C1 and C2.    20

C.F.R. pt. 404, subpt. P, App. 1, § 12.00A(2)(c).    For listing 12.04, the criteria in both C1 and

C2 require evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly
   structured setting(s) that is ongoing and that diminishes the symptoms and signs of
   [the claimant's] mental disorder and

2. Marginal adjustment, that is the [claimant has] minimal capacity to adapt to changes
   in [the claimant's] environment or to demands that are not already part of [the
   claimant's] daily life.

20 C.F.R. pt. 404, subpt. P, App. 1, § 12.04C(1) & (2) (internal citations omitted).

      "Marginal adjustment" means that the claimant's adaptation to the requirements of daily

life is fragile; that is, the claimant has minimal capacity to adapt to changes in his environment or

to demands that are not already part of his daily life.    20 C.F.R. pt. 404, subpt. P, App. 1, §

12.00G(2)(c).    Marginal adjustment may be demonstrated with evidence to show that changes or

increased demands led to exacerbation of symptoms and signs and deterioration in functioning.

*Id*.

9

When evaluating the severity of mental impairments, the Commissioner is obliged to apply a "special technique." 20 C.F.R. §§ 404.1520a and 416.920a. If the Commissioner determines that the claimant has a medically determinable mental impairment(s), then the Commissioner must rate the degree of functional limitation resulting from the impairment(s). 20 C.F.R. §§ 404.1520a(b) and 416.920a(b). The four broad functional areas track the same areas contemplated in paragraph B of the mental impairment listings, i.e., understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). The special technique is completed at the initial, reconsideration, and at the administrative law judge levels. 20 C.F.R. §§ 404.1520a(e) and 416.920a(e).

On or about March 19, 2020, non-examining agency psychologist, Carissa Bokelberg, Psy.D., reviewed the record at the initial agency level and opined that Payne had medically determinable impairments of bipolar disorder and attention deficit hyperactivity disorder that did not precisely satisfy the diagnostic criteria for the paragraph A criteria of the respective listings. (Tr. 84-85). In addition, she found that Payne had moderate limitations of functioning in all four of the areas of mental functioning contemplated in the paragraph B criteria of the listings. *Id*. Finally, she found that the evidence did not establish the presence of the paragraph C criteria. *Id*. Bokelberg then proceeded to complete a mental residual functional capacity assessment form. (Tr. 86-89).

On September 14, 2020, non-examining agency psychologist, James Pinkston, Ph.D., reviewed the record and completed the special technique with findings that were consistent with Dr. Bokelberg. (Tr. 96-99).

10

In her application of the special technique, the ALJ, like the agency psychologists before her, found that Payne had moderate, i.e., less than marked, limitations in all four functional areas. (Tr. 30-33). Consequently, she determined that Payne did not satisfy the paragraph B criteria for listings 12.04 and 12.11. *Id*. She further found that the evidence failed to establish the presence of the paragraph C criteria. *Id*. Finally, the ALJ determined that Payne's impairments, whether individually or in combination, did not medically equal a listed impairment. *Id*. In so deciding, she explicitly considered listings 12.04 and 12.11. *Id*.

Payne initially argues that the ALJ erred because she purportedly failed to consider his treating mental health records until step four of the sequential evaluation process. Upon review, however, it is manifest that the ALJ repeatedly cited Payne's mental health clinic follow-up records. (Tr. 31-33). For example, she acknowledged some positive findings during mental status examinations such as "impulsive eye contact, slow and monotone speech, an apathetic mood, impaired insight, and impaired judgment." (Tr. 31). Nonetheless, she further noted that Payne had "no hallucinations, an alert and oriented sensorium, intact memory, average [intelligence], intact thought processes, and unremarkable thought content." *Id*. In fact, the ALJ emphasized that clinical follow-up notes documented that Payne's bipolar disorder was "mild" and that he was doing well on his medication regimen with no side effects. (Tr. 32). An ALJ may properly rely on activities of daily living and mental status examinations as part of her decision-making process. *Daigle v. Kijakazi*, No. 22-30721, 2023 WL 4501865, at *3 (5th Cir. July 12, 2023).

Insofar as the thrust of Payne's argument is that the ALJ deferred discussion of PMHNP

Ursula Brooks-Ware's[5] November 6, 2020, Mental Residual Functional Capacity Questionnaire (the "Questionnaire") until the residual functional capacity section of the ALJ's decision, there was no error.   First, at least two pages of the four-page Questionnaire address considerations directly pertinent to whether Payne's mental impairments meet the criteria for listing-level severity at step three of the sequential evaluation process.   Under the regulations, however, the Commissioner will *not* provide *any* analysis regarding statements about whether a claimant meets or medically equals a listing because such issues are reserved to the Commissioner.   20 C.F.R. § 416.920b(c).

Second, even if the ALJ should have discussed the Questionnaire at step three of her decision, any error was harmless because, later in her decision, the ALJ weighed PMHNP Brooks-Ware's statement, but found it unpersuasive.   *See* Tr. 39 and discussion, *infra*.   The court does not envision a scenario where the ALJ would have changed her mind concerning the weight she decided to accord PMHNP Brooks-Ware's statement had she instead moved her assessment forward in her decision.

Of course, the foregoing observation raises Payne's related argument, which is that the ALJ incorrectly found PMHNP Brooks-Ware's statement to be unpersuasive.   The court emphasizes that for claims filed on or after March 27, 2017, the Commissioner no longer affords "controlling weight" to the opinions of treating medical providers and will not defer or give any specific evidentiary weight to any medical opinion(s) from the claimant's medical sources.   20 C.F.R. §§ 404.1520c(a) and 416.920c(a); *see also Webster v. Kijakazi*, 19 F.4th 715, 719 (5th Cir. 2021).   Furthermore, the fact that a medical source actually examined the claimant or

---

[5] PMHNP Brooks-Ware was Payne's treating medical provider.

specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion. *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c). Rather, when determining the persuasiveness of a medical opinion, the most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

"Supportability" focuses upon how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s) . . ." 20 C.F.R. §§ 404.1520c(c)(1) and 416.920c(c)(1). "Consistency" refers to how "consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim . . ." 20 C.F.R. §§ 404.1520c(c)(2) and 416.920c(c)(2).

Only when two or more medical opinions about the same issue are both equally well-supported and consistent with the record, but "not exactly the same," will the Commissioner then articulate how she considered the "other most persuasive factors," such as the medical source's relationship with the claimant (including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship); the medical source's specialization; and other factors (including a medical source's familiarity with other evidence of the claim or an understanding of the agency's disability program's policies and evidentiary requirements). 20 C.F.R. §§ 404.1520c(b)(3)-(c) and 416.920c(b)(3)-(c). Otherwise, the Commissioner, may, but is not required to explain these additional factors. 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

In her decision, the ALJ determined that PMHNP Brooks-Ware's Questionnaire was inconsistent with the evidence as a whole and with the analysis by the state agency

psychologists. (Tr. 39). She further found that the Questionnaire was not supported by Brooks-Ware's own findings and observations. *Id*. The ALJ then detailed excerpts from Brooks-Ware's treatment notes that reflected mild symptoms. *Id*. For example, at a December 3, 2019, follow-up, Payne was doing well, with a good mood. (Tr. 313-317). Payne was able to initiate tasks, complete them, and move on to the next one. *Id*. All medications were working well for him. *Id*. His concentration/focus was fair. *Id*. He reported getting along with family since his last visit. *Id*. His intelligence was average. *Id*. Although his insight and judgment were impaired, with euthymic and apathetic mood, he remained happy and his thought processes were intact. *Id*. Brooks-Ware characterized Payne's bipolar disorder as "mild" with unpredictable mood swings. *Id*.

Similarly, on May 6, 2020, Payne was doing well, with his last angry episode one month earlier when he became verbally abusive because his grandmother would not allow him to have a friend over. (Tr. 340-342). His grandmother reported that he had body odor and will go days without showering. *Id*. Nonetheless, he remained happy, with intact memory and average intelligence. *Id*. Although his insight and judgment remained impaired, his concentration/focus was fair. *Id*. Ultimately, Brooks-Ware, as usual, if not always, characterized Payne's bipolar disorder as mild. *Id*.

It also is worth noting that, on her Questionnaire, PMHNP Brooks-Ware assigned a current GAF score of 65, which indicates but mild symptoms.[6] (Tr. 380). In other words, not

---

6  "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd*, 239 F.3d at 701, n.2 (citing American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. 1994) (DSM-IV)). A GAF of 61-70 indicates "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has**

only are the "marked" limitations of functioning selected by Brooks-Ware on the Questionnaire inconsistent with her own treatment notes, the limitations also are internally inconsistent with the assigned GAF score on the form itself.

In short, the undersigned finds that the ALJ provided good cause to discount PMHNP Brooks-Ware's Questionnaire.[7]

Payne further faults the ALJ's findings regarding the paragraph B criteria for the relevant listings because the ALJ failed to discuss his ability to perform certain work activities and, ultimately, for declining to find that they resulted in "marked" impairments.    (Pl. Brief, pgs. 5-8).    However, the ALJ supported her findings with citations to record evidence.    (Tr. 30-33).    Moreover, the ALJ's characterization of the paragraph B criteria as "moderate," is supported by, and consistent with the findings of the agency psychologists.    *See* Tr. 84-90 96-99.    In addition,

---

**some meaningful interpersonal relationships**."    DSM-IV, pg. 32.    The court acknowledges that the GAF has fallen out of favor in the mental health community.    However, it still serves to denote that provider's assessment of the individual's overall functioning level, at that time. Furthermore, the Questionnaire form, which likely was supplied by Payne or his attorney, included a blank for the GAF.

[7] *See Ward v. Barnhart,* 192 Fed. App'x. 305, 308 (5th Cir. 2006) *Nugent v. Astrue,* 278 Fed. App'x. 423, 426 (5th Cir. 2008) (conflicting medical evidence supported ALJ's decision to place little weight on physician's opinion); *Richard ex rel. Z.N.F. v. Astrue*, 480 Fed. App'x. 773, 779 (5th Cir. 2012) (ALJ may discredit physician's opinion by pointing to contrary evidence, albeit however tersely); *Garth v. Astrue,* 393 F. App'x. 196, 199 (5th Cir. 2010) (court noted that ALJ *could have* discounted treating physician's opinion because the opinion contradicted his own treatment notes and the claimant's admissions); *Vansa v. Astrue,* 423 F. App'x 381, 383 (5th Cir. 2011) (upholding ALJ's decision to discount treating physician's opinion because, as the ALJ explained, it was "not supported by the objective findings of his own clinic notes nor by the evidence as a whole."); *Webster, supra* (ALJ considered both the consistency and supportability of the physician's testimony, but ultimately determined that physician's testimony was only "supported" by his own findings and was inconsistent with the claimant's medical history and longitudinal psychiatric treatment records); *Daigle, supra* (ALJ made credible choice finding physician's opinion unpersuasive in light of multiple other pieces of medical evidence).

the agency psychologists specifically considered the additional work activities that Payne raised in his brief but found that they imposed no more than "moderate" limitation of functioning.  *Id*. Of course, the ALJ determined that the findings of the agency psychologists were "persuasive." (Tr. 38-39).

Payne also seems to argue that the significant limitations of functioning recognized by the ALJ in her RFC determination propel a finding that he suffered marked limitations of functioning in these areas at step three.   Again, however, the agency psychologists, who are specialists in the mechanics of the SSA program, characterized these limitations as no more than moderate.  (Tr. 84-90 96-99).   Moreover, this assessment is consistent with the Fifth Circuit's statement in *Bordelon v. Astrue*, that restrictions to rare public interaction, low stress, and simple, one-to two-step instructions reflect "moderate" limitations.  *Bordelon v. Astrue*, 281 Fed. App'x. 418, 423 (5th Cir. 2008).

As for the paragraph C criteria of Listing 12.04, both agency psychologists found that the evidence did not establish the presence of the "C" criteria.   (Tr. 85, 96).   Furthermore, at minimum, there is no indication that Payne suffers only "marginal adjustment," on account of his bipolar disorder.[8]   There is no evidence that changes or increased demands have led to exacerbation of Payne's symptoms and signs and to deterioration in his functioning.   *See* 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00(G)(2)(c).   The court fully appreciates that Payne lives with his grandparents and that his grandmother has to provide him with meals, fill his medication planner, remind him to bathe, chauffeur him places, and wash his clothes.   *See* Tr. 66-68, 237.

---

[8]  Listing 12.11 does not include a "paragraph C."   Under the SSA's Program Operations Manual System (POMS), the adjudicator cannot find medical equivalence when one of the mental impairments is evaluated under a listing that does not contain "paragraph C" criteria. (POMS DI 24583.010   DETERMINING MEDICAL EQUIVALENCE FOR MENTAL IMPAIRMENTS).

However, the evidence indicates that much of Payne's dependence stems from his reluctance to do anything except on his own terms. *See* Tr. 70-71. The record does not establish that this reticence is attributable to Payne's bipolar disorder, rather than his own volition. Certainly, there is evidence that he is capable of focusing, concentrating, persevering, and interacting with others when he chooses to do so. *See* Tr. 71, 74 (obsessed with video games and sometimes has a friend come over to play video games with him).

Payne also faults the ALJ for failing to consider all of his physical impairments either individually or in combination with his mental impairments at step three of the sequential evaluation process. Specifically, Payne contends that the ALJ failed to consider the effects of his right eye blindness and obesity. However, the ALJ found at step two that Payne's alleged right eye blindness was not a medically determinable impairment because the record did not contain objective medical evidence of the impairment from an acceptable medical source. (Tr. 30).

As the ALJ noted in her decision, the regulations provide that,

impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source. We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s). After we establish that you have a medically determinable impairment(s), then we determine whether your impairment(s) is severe.

20 C.F.R. § 416.921 (in pertinent part).

Furthermore, "[o]bjective medical evidence means signs, laboratory findings, or both." 20 C.F.R. § 416.902(k). "Signs," in turn, "means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms).

17

Signs must be shown by medically acceptable clinical diagnostic techniques . . ."  20 C.F.R. § 416.902(l).   Finally, "Laboratory findings means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques.   Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X–rays), and psychological tests."  20 C.F.R. § 416.902(g).

Here, Payne's grandmother testified that Payne has been blind in his right eye since birth but has perfect vision in his left eye.   *See* Tr. 74-75.   As detailed in the above regulations, and in the ALJ's decision, a claimant's statement, and even a medical opinion, does not suffice to establish the existence of an impairment.

In a series of footnotes in his brief, Payne argues that the ALJ committed legal error because the administrative record includes a 2012 psychological testing report by David Williams, Ph.D., which references a 2005 psychiatric evaluation by Dr. Vandenberg that included an Axis III diagnosis for right eye blindness.   (Pl. Brief, pgs. 3-4, n.10-13; Tr. 298). In his own Axis III finding, however, Dr. Williams "deferred to the MD."   (Tr. 301).   Further, Dr. Vandenberg's report does not appear in the record, and, thus, there is no indication that the right eye blindness diagnosis is supported by the requisite objective medical evidence.   As a result, the ALJ correctly noted that the record contained no *objective* medical evidence of right eye blindness, as required to find that the alleged condition was a medically determinable impairment.   Because Payne's alleged right eye blindness was not a medically determinable impairment, the ALJ properly omitted consideration of that impairment in her step three analysis,

and beyond.[9]

As for his obesity, Payne argues that the ALJ erred by failing to consider whether the impairment met or equaled Listing 1.04.[10]  Social Security Ruling 19-2P explains that, "[o]besity is not a listed impairment; however, the functional limitations caused by the MDI of obesity, alone or in combination with another impairment(s), may medically equal a listing.   For example, obesity may increase the severity of a coexisting or related impairment(s) to the extent that the combination of impairments medically equals a listing."   *Soc. Sec. Ruling, SSR 19-2p; Titles II & XVI: Evaluating Cases Involving Obesity*, (May 20, 2019) ("SSR 19-2P").

Under Listing 1.04(A), however, there must be evidence, *inter alia*, of neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss accompanied by sensory or reflex loss.   *See* 20 C.F.R. pt. 404, subpt. P, App. 1, § 1.04(A)-(C).   Under Listing 1.04(B), the claimant must have severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours.   *Id.*   Listing 1.04(C) requires chronic non-

---

[9] Even if the ALJ *should* have considered the effect of his alleged right eye blindness, the error was harmless.   Payne contends that the ALJ should have addressed partial blindness under Listings 2.02, 2.03, and 2.04.   Those listings, however, require a specified loss of central visual acuity, contraction of the visual field, or loss of visual efficiency, respectively, in the *better* eye. *See* 20 C.F.R. pt. 404, subpt. P, App. 1, §§ 2.02, 2.03, and 2.04.   Here, there is no medical evidence that Payne has any deficiency with his better eye.   To the contrary, his grandmother testified that he has perfect vision in his left eye.

Alleged blindness in one eye also would not have affected the jobs identified by the vocational expert.   *See* Industrial Cleaner, DOT Code # 381.687-018, 1991 WL 673258 (depth perception, accommodation, and field of vision are not present); inspector/hand packager, DOT # 559.687-074, 1991 WL 683797 (depth perception and field of vision are not present); and laundry folder, DOT # 369.687-018, 1991 WL 673072 (depth perception and field of vision are not present).

[10] Listing 1.04 apparently was replaced by Listings 1.15 and 1.16 in 2020.   However, there is no indication that the substituted listings lowered the threshold for listing-level severity.

radicular pain and weakness that results in inability to ambulate effectively.    *Id*.

In this case, there is no evidence that Payne experiences any physical pain, limitation of motion, motor loss, sensory loss, weakness or inability to ambulate effectively.    Apart from his unsubstantiated right eye blindness, even Payne's grandmother could not identify any physical problems.    *See* Tr. 74-75.    Furthermore, Payne's treating provider consistently found no physical limitations.    *See, e.g.*, Tr. 340-341 (no chest pain, no arm pain on exertion, no shortness of breath, no exercise intolerance, no weakness, and no numbness).    In short, Payne's obesity does not begin to approach the severity requirements for a listing, which also might explain why the ALJ did not discuss it.[11]    Regardless, it is manifest than any error was harmless.[12]

Payne further contends that the ALJ failed to consider whether his obesity, in combination with his mental impairments, equaled an impairment.    The ALJ may have pretermitted the discussion because, at least under the current version of the POMS, "[i]t is generally not appropriate to medically equal a mental disorders listing using a combination of physical and mental impairments."    POMS DI 24583.010  DETERMINING MEDICAL EQUIVALENCE FOR MENTAL IMPAIRMENTS.    Nevertheless, any error was harmless because, in the absence of any evidence that Payne's obesity imposed any functional limitations (apart from the ALJ's gratuitous reduction of his work capacity to the medium exertional level, *see* discussion,

---

[11]  Payne does not point to evidence indicating that his obesity meets all of the criteria for a specific listing.

[12]  "Procedural perfection in administrative proceedings is not required."    *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).    Procedural improprieties "constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir.1988); *see also Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights).

*infra*), there is no indication that combining the effects of his obesity with his mental impairments would increase the effect of any one impairment to listing-level severity.   *See* 20 C.F.R. § 416.926; *see also Abate v. U.S. Comm'r*, Civ. Action No. 14-2889, 2015 WL 9581537, at *7 (W.D. La. Dec. 10, 2015), *R&R adopted,* 2015 WL 9484529 (W.D. La. Dec. 29, 2015) (rejecting claimant's step three argument where the claimant failed to explain how the combination of hypertension and obesity, along with her spine condition, satisfies the requirements for any listing or medically equals any listing); *J.A.L., Jr. v. U.S. Com'r, Soc. Sec. Admin.*, Civ. Action No. 10-1272, 2011 WL 5866226, at *3 (W.D. La. Oct. 24, 2011), *R&R adopted*, 2011 WL 5873073 (W.D. La. Nov. 22, 2011) (decision as a whole adequately explains the impact of obesity on plaintiff's limitations such that the lack of a more specific discussion of obesity is at best a procedural and harmless error).[13]

In sum, the court finds that the ALJ's step 3 determination is supported by substantial evidence and remains free of legal, i.e., reversible error.

---

[13] In a footnote in his reply brief, Payne cites two Fifth Circuit decisions that found reversible error where the ALJ failed to consider the combined effect of the plaintiff's impairments.   (Pl. Reply Brief, pg. 2 n.3 (citing *Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir.2000) and *Scott v. Heckler*, 770 F.2d 482, 487 (5th Cir.1985)).   In *Loza*, however, the ALJ's finding that the plaintiff's mental impairment was non-severe was not supported by substantial evidence.   *Loza, supra*.   Moreover, in *Scott*, the court primarily reversed the decision because the ALJ improperly discounted the opinion of the plaintiff's treating physician, and then further instructed the ALJ on remand to consider the combined effect of plaintiff's *multiple physical* impairments.   *Scott, supra*.   Those circumstances are not present here.

Payne also cites a plethora of cases from other circuits and districts, including, *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x. 411, 416 (6th Cir. 2011).   However, those cases are not binding on this court.   Moreover, in *Reynolds*, the court stated that it was possible that the evidence plaintiff could put forth would meet the listing.   Payne has not made that showing here.

## II.    RFC

Payne contends that the ALJ erred by failing to cite to evidence that he retains the

capacity to perform work at the medium exertional level.[14]   He is correct that the ALJ failed to

cite evidence to support her medium exertional capacity finding.   However, the record all but

uniformly supports no physical limitations at all.   *See, e.g.*, Tr. 340-341 (no chest pain, no arm

---

[14]  Medium work is defined and explained by Social Security Ruling 83-10:

> [t]he regulations define medium work as lifting no more than 50
> pounds at a time with frequent lifting or carrying of objects
> weighing up to 25 pounds.   A full range of medium work requires
> standing or walking, off and on, for a total of approximately 6
> hours in an 8-hour workday in order to meet the requirements of
> frequent lifting or carrying objects weighing up to 25 pounds.   As
> in light work, sitting may occur intermittently during the remaining
> time.   Use of the arms and hands is necessary to grasp, hold, and
> turn objects, as opposed to the finer activities in much sedentary
> work, which require precision use of the fingers as well as use of
> the hands and arms.
>
> The considerable lifting required for the full range of medium
> work usually requires frequent bending-stooping.   (Stooping is a
> type of bending in which a person bends his or her body downward
> and forward by bending the spine at the waist).   Flexibility of the
> knees as well as the torso is important for this activity.
> (Crouching is bending both the legs and spine in order to bend the
> body downward and forward).   However, there are a relatively
> few occupations in the national economy which require exertion in
> terms of weights that must be lifted at times (or involve equivalent
> exertion in pushing or pulling), but are performed primarily in a
> sitting position, e.g., taxi driver, bus driver, and tank-truck driver
> (semi-skilled jobs).   In most medium jobs, being on one's feet for
> most of the workday is critical.   Being able to do frequent lifting
> or carrying of objects weighing up to 25 pounds is often more
> critical than being able to lift up to 50 pounds at a time.

*Social Security Ruling 83-10*: TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER
WORK--THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2 (SSR 83-10).

pain on exertion, no shortness of breath, no exercise intolerance, no weakness, and no numbness); Tr. 240 (no exertional limitations checked); Tr. 258 (grandmother conceded that Payne was not physically disabled). Even if Payne's RFC were reduced to work at the *light* exertional capacity,[15] that would not affect the outcome in this case because the ALJ and the vocational expert also identified jobs at the light exertional level that Payne could perform. *See* Tr. 40, 76-78.

Payne further mentioned, via passing footnote, that the ALJ found that his ability to perform work at the medium exertional level was impeded by "additional limitations," but then failed to identify these additional limitations. (Tr. 40). However, the ALJ made that statement in the context of her step five determination in order to explain why she could not rely exclusively on the medical-vocational guidelines, and, consequently, was obliged to employ the services of a vocational expert. *Id*. When read in context, it is clear that the "additional limitations" mean the non-exertional limitations imposed by Payne's mental impairments.

Finally, Payne does not assert any argument regarding the ALJ's assessment of the effects of his mental impairments that were not raised and/or addressed pursuant to his step three arguments. *See* discussion, *supra*. Indeed, the ALJ provided good cause to discount PMHNP Brooks-Ware's Questionnaire. *See* discussion, *supra*. Furthermore, the ALJ's mental RFC is substantially supported by the opinions of the agency psychologists, which the ALJ credited. (Tr. 38-39, 86-89, 97-99).[16]

---

[15] When, as here, the ALJ determines that a claimant can perform medium work, she also *per se* determines that he can perform light work. 20 C.F.R. § 416.967(c).

[16] An RFC limited to simple work reasonably incorporates moderate limitation in concentration, persistence, or pace. *See Reid v. Astrue*, Civ. Action No. 10-0237, 2011 WL 4101302 (S.D.

In sum, the court finds that the ALJ's RFC determination is supported by substantial evidence and remains free of legal error.

## III.    Step Five

Payne initially argues that the ALJ failed to acknowledge that, at step five, the Commissioner has the burden of showing that the claimant can make an adjustment to other work that exists in substantial numbers in the national economy.    The Commissioner's Hearings, Appeals and Litigation Law Manual ("HALLEX") specifies that "[i]f a disability case is decided at step 5 of the sequential evaluation process, a statement acknowledging that the burden of showing the claimant can perform other work shifts to the Commissioner."    (HALLEX § I-2-8-25 (2017)).[17]

However, the ALJ plainly stated that,

[a]lthough the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912 and 416.960(c)).

(Tr. 29).    In other words, the ALJ explained that it was the SSA's responsibility to provide the requisite evidence and cited the regulations that confirm it is the SSA's burden.    Accordingly,

---

Miss. Aug. 15, 2011), *R&R adopted,* 2011 WL 4101277 (S.D. Miss. Sept. 8, 2011); *Madrid v. Colvin*, Civ. Action No. 12-800, 2013 WL 6641305 (N.D. Tex. Dec. 17, 2013); *Cornejo v. Colvin*, Civ. Action No. 11-470, 2013 WL 2539710 (W.D. Tex. June 7, 2013).

[17] "While HALLEX does not carry the authority of law . . . where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required.    If prejudice results from a violation, the result cannot stand."    *Newton*, 209 F.3d at 459 (citations and internal quotation marks omitted).

the ALJ did not err.   Regardless, the Commissioner met her step five burden by obtaining

evidence from the vocational expert ("VE").   Therefore, Payne did not suffer cognizable

prejudice.

Payne next argues that the ALJ failed to confirm the VE's impartiality, expertise, and

professional qualifications, plus neglected to solicit any objections from the claimant and his

representative to the VE testifying, as required by HALLEX I-2-6-74B.[18]   Again, however,

while the ALJ may not have confirmed on the record all that is required by HALLEX I-2-6-74B,

Payne has not shown resulting prejudice.   For example, the VE's resumé appears in the record

and confirms that she has a Certificate of Graduate Study in Psychiatric Rehabilitation and a

Master of Science in Rehabilitation Counseling with over ten years of relevant experience.   (Tr.

278-279).   Furthermore, the ALJ confirmed that the VE had reviewed the file and that she was

present throughout the hearing.   (Tr. 75-76).   As it turns out, however, there was no vocational

evidence for the VE to review because Payne had no past work experience at all.

Payne also does not provide any basis for doubting or questioning the VE's impartiality.

Indeed, it is exceedingly unlikely that a VE based in Lancaster, South Carolina, had any outside

knowledge of, or interaction with Payne, who is a Louisiana resident.   Certainly, Payne has not

identified any such conflict.   In addition, while the ALJ did not ask the claimant and his

representative whether they had any objections to the VE testifying, the ALJ afforded Payne's

---

[18] Specifically, the ALJ must, *inter alia*:
"• Ask the VE to confirm his or her impartiality, expertise, and professional qualifications;
• Verify the VE has examined all vocational evidence of record;
• Ask the claimant and the representative whether they have any objection(s) to the VE testifying
. . ."
(HALLEX I-2-6-74).

attorney the opportunity to question the VE.   (Tr. 78).   Counsel, however, had no questions for the VE.   *Id*.

Payne also argues that the ALJ breached her obligation to confirm whether there were conflicts between the VE's occupational evidence and the *Dictionary of Occupational Titles*. However, the ALJ had the VE confirm that the jobs she identified were consistent with those in the *Dictionary of Occupational Titles*.   (Tr. 78).   Moreover, Payne has not identified any supposed conflict between the VE's testimony and the *Dictionary of Occupational Titles*. Accordingly, Payne has not demonstrated that he was prejudiced by the ALJ's alleged failure to comply with the HALLEX.   *See Derise v. McMahon*, 222 Fed. App'x. 419 (5th Cir. 2007) (declining to find reversible error even where the VE failed to list any available jobs or their incidence).

Finally, Payne argues that the ALJ erred because she did not address whether he could maintain employment on a regular, ongoing basis.   *See Watson v. Barnhart*, 288 F.3d 212, 218 (5th Cir. 2002) and *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).   However, the Fifth Circuit has made it clear that nothing in *Watson* or *Singletary* suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case."   *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005) (citation omitted); *Patterson v. Astrue*, 324 Fed. App'x. 419, 422 (5th Cir. 2009).   Thus,

> absent evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of [residual functional capacity] we do not . . . require a specific finding that the claimant can maintain employment.

*Patterson,* 324 Fed. App'x at 422 (quoting *Dunbar v. Barnhart,* 330 F.3d 670, 672 (5th Cir.

26

2003)).    For example, in *Singletary,* there was evidence that the claimant had been unable to

hold a job for more than limited periods of time and that he had been hospitalized repeatedly

over a long period of time for his psychiatric problems.    *Dunbar, supra* (citation omitted).

Absent such a showing, the claimant's ability to maintain employment is subsumed within the

RFC determination.    *Perez, supra*.

In his brief, Payne cites to multiple references in the record where his temper flared or

when he acted out in response to rules and limits that were imposed on him.    (Pl. Brief, pg. 9,

n.26).    However, in her RFC determination, the ALJ specifically restricted Payne's contact with

others and required jobs with a routine and predictable setting with no significant changes.    (Tr.

34).    In other words, the RFC contemplated the sporadic flareups and symptoms of Payne's

impairments by reducing the work situations and interactions that could disrupt his baseline.[19]

Furthermore, because of Payne's lack of prior work experience, there is no evidence that his

impairments preclude him from maintaining a job.

In short, the present case does not present the limited and special circumstances that

require the ALJ to make a separate finding that the claimant is able to maintain employment.

*See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *Latoski v. Astrue*, Civ. Action No. 09-

0198, 2011 WL 4526086, at *15 (N.D. Tex. Sept. 13, 2011), *R&R adopted,* 2011 WL 4485802

(N.D. Tex. Sept. 28, 2011) (ALJ not required to make separate finding on ability to maintain job

where no evidence that claimant's bipolar disorder fluctuated between manic and depressive

---

[19] Also, the ALJ specifically stated that the RFC contemplated the individual's ability to do
physical and mental work on a sustained basis despite limitations from his impairments.    (Tr.
28).    She further cited the pertinent regulation that explains that RFC means work activity on a
regular and continuing basis.    *Id*. (citing 20 C.F.R. § 416.945).

states resulting in fluctuating periods of apparent stability and periods of definite incapacitation).

Accordingly, the undersigned finds that the ALJ's step five finding is supported by substantial evidence and is free of legal error.

## <u>Conclusion</u>

The ALJ in this case was tasked with determining whether the claimant was disabled. In so doing, she considered the hearing testimony, the medical records, and expert opinion evidence. The evidence was not necessarily uniform, and according to Payne, should have compelled a different result. However, conflicts in the evidence are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs *against* the Commissioner's decision." *Newton, supra* (emphasis added).[20] That is not to say that the Commissioner's decision necessarily is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision. *Mays, supra; Morris, supra.*

For the foregoing reasons, the undersigned finds that the Commissioner's determination that the claimant is not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error. Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its

---

[20] Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue*, 400 Fed. App'x. 929, 932 (5th Cir. 2010) (citation omitted). One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result. *Id*. This exception is applicable here.

entirely, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.    A party may respond to another party=s objections within **fourteen (14) days** after being served with a copy thereof.    A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.    Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 24th day of July, 2023.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

29